Paul D. Friedman (#012716)
**BURG SIMPSON ELDREDGE
HERSH & JARDINE PC**
2390 East Camelback Rd., Suite 403
Phoenix, AZ 85016
Phone 602-777-7000
Fax 602-777-7008
pfriedman@burgsimpson.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## DISTRICT OF ARIZONA

| | |
|---|---|
| **KellyJo Robinson,** | Civil Action No. _____ |
| **Plaintiff,** | **PLAINTIFF'S COMPLAINT AND JURY DEMAND** |
| **v.** | |
| **Janssen Pharmaceuticals, INC.,** | |
| **Defendant.** | |

Plaintiff, KellyJo Robinson, by and through counsel, and for her Complaint and Jury Demand against Defendant Janssen Pharmaceuticals, Inc., alleges as follows:

### JURISDICTION AND VENUE

1.      Plaintiff KellyJo Robinson is a resident and citizen of Apache Junction, in Pinal County, Arizona.

2.      Defendant Janssen Pharmaceuticals, Inc. ("Janssen) is a Pennsylvania corporation. Upon information and belief, its principal place of business is in Mercy County, New Jersey.

3.      Defendant Janssen manufactures, markets, and distributes the prescription drug Elmiron.   This court has personal jurisdiction over Defendant as Defendant

purposefully availed itself of the privilege of conducting business and activities within this State, and Plaintiff's claims relate to Defendant's contacts and actions within this State regarding its marketing and distribution of Elmiron.

4.     Plaintiff alleges damages in excess of $75,000, exclusive of interest and costs.

5.     This Court has jurisdiction pursuant to 28 U.S.C. §1332, as complete diversity exists between Plaintiff and Defendant and the amount in controversy exceeds $75,000.

6.     Venue is proper within this district pursuant to 28 U.S.C. §1391, because a substantial part of the events giving rise to this action occurred in this district.

## FACTUAL BACKGROUND

### Elmiron development, efficacy and safety issues

7.     Defendant manufactures, markets and distributes the prescription drug Elmiron, which contains 100 mg. of the active ingredient pentosan polysulfate sodium ["PPS"], sold in capsule form.

8.     Elmiron is indicated for the treatment of interstitial cystitis ["IC"], a rare condition characterized by bladder pain and discomfort.

9.     Because no cure exists for IC, patients prescribed a drug for treatment of IC symptoms could remain on the drug for decades.

10.     The etiology of IC is unknown.  Several theories have been suggested, including the theory that a defect in the mucosal (glycosaminoglycan) layer of the bladder leads to irritation of the bladder wall.

11.     PPS has the biochemical properties of sulfated glycosaminocglycans, including an affinity for mucosal membranes.

12.     The rationale for the use of Elmiron was that PPS would over time lead to a repair of the presumably defective coating of the bladder wall and thereby reduce symptoms of irritation.

13.     FDA designated Elmiron as an orphan drug on August 7, 1985, meaning that it was intended for treatment of a rare condition that affects less than 200,000 people in the United States.   Orphan drug status provides economic incentives for manufacturers to develop drugs for rare diseases or conditions.

14.     The original Sponsor of the New Drug Application ["NDA"] for Elmiron, Baker Norton Pharmaceuticals Inc., filed for marketing approval on June 11, 1991.   The Sponsor supported the NDA with limited scientific data, including two efficacy studies.

15.     Efficacy Study E-001 presented data from 110 subjects, 54 exposed to Elmiron and 56 to placebo, from investigators at 5 sites.   Study E-002 presented data from 148 subjects, 74 in each of the Elmiron and placebo groups, from investigators at 7 sites. Three of the investigators participated in both studies.   Thus, the total number of patients exposed to Elmiron in these two efficacy studies was 128.

16.     FDA rejected Study E-001 as support for the efficacy of Elmiron in treating IC due to its lack of independence from Study E-002 and because it only had positive results for one of six study endpoints.   The positive results did not reach statistical significance when analyzed using methodology required for studies reporting multiple endpoints. These positive results were seen at only one site – a site ran by Phillip Hanno, MD.

17.     In rejecting study E-001, FDA noted: "The success rate at center 1 [Phillip Hanno, MD] is significantly different than the other sites and is responsible for the overall

effect."  Hanno reported 8 patients whose overall evaluation was "better" after treatment with Elmiron compared to 7 patients who were "not better," thus indicating a marginally favorable response for Elmiron.  None of the other four investigators reported favorable results for Elmiron. In fact, their combined results demonstrated only 7 patients who were "better" versus 32 who were "not better" after Elmiron treatment. Across all five sites, only 15 of 54 subjects in E-001 reported improvement with Elmiron, while 7 of 56 subjects reported improvement on placebo.

18.     Study E-002 provided positive results for only 2 of 6 study endpoints. Once again, the FDA Medical Reviewer questioned the data, noting that the data from center 1 appeared to be skewed.  This time center 1 was operated by C. Lowell Parsons, MD.  The reviewer again stated: "The success rate at center 1 [C. Lowell Parsons, MD] is significantly different than the other sites and is responsible for the overall effect."

19.     The data from Dr. Parsons in Study E-002 was far out of line with the data from any other investigator in either study.  In fact, other than the one result from Dr. Hanno in Study E-001 where he reported 8 subjects given Elmiron being "better" and 7 "not better," no other investigator at any site in either study showed more patients "better" than "not better" on Elmiron.

20.     Yet in Study E-002, Dr. Parsons reported 10 subjects treated with Elmiron were evaluated as "better" and 5 "not better," while only 2 subjects given placebo were "better" and 12 were "not better."  The other six investigators combined reported 14 subjects given Elmiron were "better" and 45 were "not better," and for placebo treatment 10 were "better" compared to 50 "not better."  In other words, Parsons reported that 66.6% of the

4

subjects were "better" with Elmiron compared to 14.3% who claimed to be "better" on

placebo, while the other six investigators combined reported only 23.7% were "better" after

taking Elmiron, compared to 16.6% who claimed to be "better" after given the placebo.

21.     An FDA Group Leader, John Kenealy, MD observed:

"The reviewing statistician has made the important observation that in each
of the studies herein presented, elimination of the results from one of the
centers all but destroys the statistical significance of the result of that study.
The medical review has indicated that **one of these two investigators is
known to have a financial interest in this drug**.  Because of the strong
influence of these centers on the outcome, Scientific Investigations has been
requested to audit the records of these centers for these studies." [emphasis
added.]

22.     After completing its review of the data, FDA issued a Non-Approvable letter

on January 27, 1993.

23.     In June of 1993, in response to the Non-Approvable letter, Baker Norton

submitted a re-analysis of the original two efficacy studies.  In this analysis, in response to

critique by the FDA, the Sponsor eliminated all data from Dr. Parsons and reanalyzed the

data.  The FDA reviewer, Dr. Waymack, commented on the Sponsor's submission of the

combined data from E-001 and E-002 after excluding all results from Dr. Parsons:

When this [exclusion of Parson's data] was done, the lowest p value obtained
was only .107[1] which was for the Overall Improvement (Investigator
Impression.)   This raises a number of possible explanations for these
significant p value obtained from the studies, other than the drug having an
effect.  These would include a different patient population at the site of Dr.
Parsons investigations, a loss of blinding, some other form of bias, or a
random statistical event.

---

[1] Note that statistical significance requires results of 0.05 or lower, thus the results without Parsons'
data provide absolutely no proof of efficacy.

24.     In other words, after excluding Dr. Parsons' data, the results from Study E-002 were far from statistically significant, which raised the serious possibility that Dr. Parsons had engaged in conduct that biased the results in favor of Elmiron.

25.     FDA rejected the re-analysis of Study E-001 and E-002 in a second Non-Approvable letter for Elmiron dated October 28, 1994.

26.     In rejecting the Sponsor's re-analysis and discussing the need for more data, Dr. Waymack concluded with the recommendation: "I strongly believe that any future pivotal trials should not include Dr. Parsons.  This would eliminate the fear of the investigator specific effect, if efficacy were determined by the future trials."

27.     U.S. Patent records indicate that Dr. C. Lowell Parsons is the inventor of the patent for sodium pentosan polysulfate (i.e. PPS or Elmiron), which he filed on July 31, 1989.  The Patent Application includes the following use: "the treatment of interstitial cystitis by the oral administration of sodium pentosan polysulfate at high dosages on the order of 200 mg. per day or more."

28.     In addition to being the inventor who submitted the Patent Application for Elmiron, Dr. Parsons apparently filed the Investigational New Drug Application for Elmiron to treat IC.

29.     In an internal FDA document, Dr. Wiley A. Chambers asks, "Why is there not complete information on the CL Parson and SG Mulhollands published study?  This study should either be completely reported in the NDA or in **Parson's IND**?"  [emphasis added.]

30.     As Dr. Waymack summarized:

Two pivotal well controlled trials had been performed and submitted to support the NDA.  These two studies were however flawed in that they had multiple investigators involved in both pivotal trials.  The studies were also flawed in that six different efficacy endpoints were chosen, and those that demonstrated statistically significant improvement in one of the trials, failed to demonstrate improvement in the other.  Additionally, there was no Bonferroni correction made to compensate for the fact that six different endpoints had been chosen.  Finally it should be noted that when reviewing the data, it was determined that if the data from a single investigator (**the champion of this therapy**) was removed from the study, not only was statistical significance lost, but even the trend towards benefit was lost.  These points are discussed in greater detail in prior reviews. (emphasis added.)

31.     In response to the second non-approvable letter from FDA, the Sponsor Baker Norton then conducted a retrospective analysis of patients enrolled in an Open Label Compassionate Use Study.

32.     Baker Norton submitted its retrospective review of the uncontrolled Compassionate Use Study to FDA in lieu of another efficacy study.  The study design (no comparison group) prevented a statistical analysis, but based on drop out rates, it was estimated that Elmiron was effective in only a 25% subgroup of the enrolled cases, since everyone else (i.e. 75%) has discontinued the drug.

33.     However, because no control group existed, no comparison could be made to determine whether or to what extent the patients who remained enrolled in the study were reporting favorable results due to Elmiron, or due to a placebo effect.  In particular, because the underlying condition of IC can vary over time, the entire effect could simply indicate the natural course of the disease.

34.     The Sponsor contended that the Compassionate Use Study demonstrated efficacy for a sub-group of individuals within those suffering from the rare condition of IC and that the NDA should be approved because of Elmiron's orphan drug status.

35.     FDA eventually approved Elmiron for treatment of IC on September 26, 1996.

36.     FDA also required as a condition of approval that the Sponsor conduct Phase IV (post-marketing) studies to address unresolved bioavailability and drug metabolism issues, and to evaluate efficacy and long term safety.

37.     In 1997, the year following NDA approval, Alza Pharmaceuticals acquired Elmiron from Baker Norton.

38.     In approximately 2001, Johnson & Johnson acquired Alza.   Johnson & Johnson's wholly owned subsidiary, Ortho McNeil Pharmaceutical, Inc., became the Elmiron NDA Sponsor, marketer, promoter and the licensee for the Elmiron trademark.

39.     In approximately 2008, Ortho McNeil Pharmaceutical, Inc. merged with Janssen, and became known as Ortho-McNeil-Janssen Pharmaceuticals, Inc., a subsidiary of Johnson & Johnson.   Ortho-McNeil-Janssen Pharmaceuticals continued as the NDA Sponsor, marketer, promoter and licensee of the trademark for Elmiron.

40.     In   approximately   2011,   Ortho-McNeil-Janssen   Pharmaceuticals,   Inc. changed its name to Janssen Pharmaceuticals, Inc.

41.     Defendant Janssen Pharmaceuticals, wholly owned subsidiary of Johnson & Johnson, remains the NDA Sponsor, marketer, promoter and licensee of the trademark for Elmiron, which it now holds from Teva Branded Pharmaceutical Products R&D, Inc.

42.     On   July   9,   2004,   Johnson   &   Johnson   Pharmaceutical   Research   & Development, L.L.C. first posted on www.clinicaltrials.gov the protocol for a study entitled:

"Effectiveness and Safety Study of Pentosan Polysulfate Sodium for the Treatment of Interstitial Cystitis."

43.     The post indicated that the study was a Phase IV study which had begun in September 2003 to compare efficacy of Elmiron for IC in three groups: patients taking 100 mg. of Elmiron once a day, patients taking 100 mg. of Elmiron three times a day, and patients taking placebo.

44.     Therefore, six years elapsed between the commitment to perform a Phase IV study and the initiation of the efficacy study.

45.      The study was financially supported by Janssen Research and Development and resulted in a published article entitled "*Pentosan Polysulfate Sodium for the Treatment of Interstitial Cystitis/Bladder Pain Syndrome: Insights from a Randomized, Double-Blind, Placebo Controlled Study*," Nickel et al, Journal of Urology: Vol. 193, 857-862 (March 2015.)

46.     As such, it took 18 years for the results of the required Phase IV efficacy study to be completed and published in a medical journal.

47.     The primary endpoint for the study was for a responder to achieve a 30% or greater reduction in score - based upon an established interstitial cystitis symptom index - after 24 weeks treatment with Elmiron.

48.     After over 50% of the planned number of patients completed the study, it was stopped because an interim analysis indicated that Elmiron provided no more symptom relief than placebo.  In fact, it provided less relief than placebo for the subgroup of patients identified as suffering from IC.

49.     Specifically, in the combined group of IC and Bladder Pain Syndrome cases, 40.7% of patients in the placebo group reported relief in symptoms, compared to 39.8% in the 100 mg. Elmiron group, and 42.6% in the 300 mg. Elmiron group.  Thus, no statistical difference existed between the three groups in regard to relief of symptoms.

50.     In a subgroup of patients who met a strict clinical definition of IC (as opposed to bladder pain syndrome), 50.6% of the patients in the placebo group reported relief of symptoms, compared to 30.3% in the 100 mg. Elmiron group and 34.5% in the 300 mg. Elmiron group.  This result indicates that Placebo provided an improvement in symptoms compared to either dose of Elmiron, which was likely statistically significant.

51.     In short, Defendant's own Phase IV efficacy study establishes that Elmiron does not work.  It did not provide improvement in symptoms of IC or bladder pain syndrome and in fact was less beneficial than Placebo for patients with IC.

52.     No data other than that submitted by the drug's "champion," Dr. Parsons, in Study E-002 [i.e. 10 "better" versus 5 "not better"] provides evidence that Elmiron provides a statistically significant relief of symptoms of IC.

53.     Another post marketing efficacy study reached the same conclusion: Elmiron does not work.

54.     In this study by G.R. Sant, et al, "A Pilot Clinical Trial of Oral Pentosan Polysulfate and Oral Hydroxyzine in Patients with Interstitial Cystitis," Journal of Neurology (2003), Vol. 170, 810-815, the authors compared PPS, Hydroxyzine and placebo.  The authors stated: "The low global response rates for PPS and hydroxyzine suggest that neither provided benefit for the majority of patients with IC."  They concluded:

"In this pilot study neither PPS nor hydroxyzine improved the global response assessment sufficiently to initiate a larger clinical trial of these agents."

55.     Janssen acknowledged in the Nickel 2015 Journal of Urology article that its study and the Sant 2003 study were "negative" studies, which it contrasted with "[e]arly studies demonstrating PPS efficacy compared to placebo enrolled patients with the more traditional diagnosis of IC."  However, these two "early" studies cited by Janssen are the published versions of E-001 and E-002, which Janssen knew as the NDA holder for Elmiron were highly flawed, non-significant and/or contained suspect, biased data.

56.     Prior to the submission of the Elmiron NDA, published medical literature indicated that Elmiron did not provide relief to symptoms of IC.  In the study  by Holm-Bentzen, et al, "A Prospective Double-Blind Clinically Controlled Multicenter Trial of Sodium Pentosanpolysulfate in the Treatment of Interstitial Cystitis and Related Painful Bladder Disease," Journal of Urology (1987) Vol. 138, 503-507, in which subjects were given 400 mg. of PPS a day, the authors stated: "We conclude that no statistically or clinically significant effect of sodium pentosanpolysulfate was found compared to placebo in patients with painful bladder disease."

57.     Further, the authors debunked the biological mechanism theory advanced by Dr. Parsons as the basis for the treatment.  "In 1977 Parsons and associates proposed the theory that the mucous layer coating the urothelium [of the bladder] had an important barrier function. ...  However, recently it has been shown that in patients with interstitial cystitis the mucous surface layer is identical morphologically to that of controls..." Id. at 503, citing

Dixon, et al, "Electron microscopic investigation of the bladder urothelium and glycocalyx in patients with interstitial cystitis," Journal of Urology (1986), Vol. 135: 621.

58.     Based upon a detailed review of the data, the authors stated: "we find a placebo effect of approximately 50 percent versus a drug effect of approximately 60 per cent," which the authors rejected as "of no clinical importance." (*Id*. at 506-507.)

59.     Thus, Janssen has been aware for decades that Elmiron was not proven effective in the treatment of IC. Besides the single set of data from Parsons' investigatory site in Study E-002, no researcher had ever found evidence of a statistically significant effect in a prospective, placebo-controlled, double-blind efficacy study. Even the proposed mechanism had been refuted as far back as 1986.

60.     The policy against administrating drugs with no proven benefit is that it exposes patients to potentially harmful drug effects for no reason and may deter the administration of alternative effective remedies.

61.     Serious adverse events have been reported with Elmiron.

62.     In the Compassionate Use study 33 patients of 2499 reported serious adverse events in the first three months of use, and 211 dropped out in the first three months due to adverse events.

63.     The serious adverse events reported in the first three months included optic neuritis; bilateral retinopathy; blurred vision with left central optic vein occlusion; and filmy sensation over left eye.

64.     Among adverse events leading to discontinuation in the Compassionate Use Study was a case of atrophic bilateral macular degeneration, which the investigator determined had a "probable" relationship to the use of Elmiron.

65.     Other adverse events relating to vision which led to discontinuation in the Compassionate Use Study included: Amblyopia, Blurred Vision; Double Vision, Lacrimation Photo Sensitive, and Visual Field Defect.

66.     In total, reported eye disorders among persons exposed to Elmiron in the Compassionate Use Study included: 6 amblyopia, 6 conjunctivitis, 2 eye disorder, 2 eye hemorrhage, 2 keratoconjunctivitis, 1 cataract unspecified, 1 eye pain, 1 optic atrophy, 1 (or 2) optic neuritis, 1 retinal artery occlusion, 1 retinal hemorrhage, 1 retinal vein thrombosis, and 1 visual field defect.

67.     Prior to the marketing of Elmiron in the United States, a subcutaneous or intramuscular injectable form of PPS called Hemoclar was marketed in France from 1961 through 1994 for use as a low molecular weight heparin and was also formulated for sublingual use to treat hyperlipoproteinemia.

68.     Hemoclar was withdrawn from the market in France in 1994 due to safety concerns.

69.     Safety issues with Hemoclar centered on bleeding and blood clotting abnormalities, as well as delayed immuno-allergic thrombocytopenia associated with hemorrhage or thrombosis (heparin induced thrombocytopenia.)

13

70.     Although the anticoagulant properties of Elmiron are estimated to be 15% of those of heparin, reports of aneurysm, stroke and thrombocytopenia are included among the adverse events reported in the clinical trials for Elmiron.

71.     Post marketing adverse events continued to include patients with serious eye problems.  From January 1997 through October 2008, 65 reports of vision problems, eye pain and serious vision disorders were submitted for Elmiron.  The adverse event reports included 4 reports of blindness, 8 reports of macular degeneration or maculopathy, 12 reporting impaired vision and 10 with blurred or halo vision.  In addition, 7 reported eye pain, 4 eye or retinal hemorrhage, and 4 others reported retinal disorder, retinopathy, retinal vascular thrombosis or retinal injury.

72.     Similarly, in the Janssen study by Nickel, et al, published in 2015, even though only 240 subjects were administered either 100 mg. or 300 mg. of Elmiron, and even though 42% of the Elmiron subjects dropped before completing the planned 4 months of use, adverse event reports included 1 patient with macular degeneration, and 4 patients with blurred vision or reduced visual acuity.

73.     In November of 2018, Pearce, et al published "Pigmentary Maculopathy Associated with Chronic Exposure to Pentosan Polysulfate Sodium, American Academy of Ophthalmology (2018), Vol. 25, No. 11, 1793-1802.

74.     Pearce describes six adult patients who had been prescribed Elmiron and had been evaluated by the study authors for vision problems.  The authors reported a unique pigmentary maculopathy (i.e. a disease of the macula, or center, of the retina) among

patients with long term exposure to Elmiron.  The patients were all prescribed 300 mg. or more Elmiron a day, with a mean length of exposure of 15 years.

75.   The findings on examination included paracentral hyperpigmentation at the level of the retinal pigment epithelium, along with vitelliform-like deposits.  Two of the patients had paracentral retinal pigment epithelium and others had generalized retinal pigment epithelium abnormalities.  The authors noted that the findings resembled those seen with macular degeneration and other macular diseases and warned that physicians should be aware of the relationship to PPS in order to avoid a mistaken diagnosis.

76.   The Elmiron patients diagnosed with the unusual maculopathy reported difficulty in reading and prolonged dark adaptation as the principal symptoms of their eye disorder.

77.   In 2019 researchers from Emory University, along with the University of Michigan and the Oregon Health and Science University, authored a multi-institutional case series of 35 patients with maculopathy after long term use of Elmiron.  Their ocular findings among patients exposed to Elmiron included hyperpigmented macular spots, interspersed pale yellow deposits, retinal pigment epithelium elevation or thickening, and a symmetric, confluent pattern of hyperautoflourescent and hypoautoflourescent spots in the fovea of the eyes extending to the retinal periphery.  Hanif, et al, "Phenotypic Spectrum of Pentosan Polysulfate Sodium-Associated Maculopathy, A Multicenter Study, JAMA (2019) Ophthalmology Vol. 137, Number 11, 1275-1282, at 1275.

78.     The Elmiron-exposed subjects in the Emory multicenter study who exhibited these findings reported visual symptoms including metamorphopsia (i.e. straight lines appear curved), blurred vision, and prolonged dark adaptation.

79.     The authors concluded: "These findings suggest that PPS-associated maculopathy is a vision-threatening condition that can manifest in the setting of long-term exposure to the drug." Id. at 1275.

80.     In December 2019 a third article on Elmiron related eye damage was published in the medical literature.   Wang, et al authored, "Pentosan-associated maculopathy: prevalence, screening guidelines, and spectrum of findings based on prospective multimodal analysis," Canadian Journal of Ophthalmology (2020) Vol , No. 55, 116-125.

81.     The authors identified Elmiron users from review of electronic medical records from the University of California Los Angeles.   50 Elmiron patients agreed to participate in the study; 10 of the 50 patients (20%) were diagnosed with PPS associated maculopathy.   The most common symptoms was night blindness, although visual distortion and blurry vision were also reported.

82.     The authors reported that there was a highly significant association between the duration of use of Elmiron: 19.2 years in the affected group compared to 6.6 years in the unaffected group.   Further the daily dose in the affected group (444.8 mg) was significantly higher than in the unaffected group (301.8 mg).   Similarly, the mean cumulative dose was significantly higher in those suffering vision damage from Elmiron (3375.4 g. v. 691.7 g.).

16

83.     The findings on evaluation of the patients in the affected group were similar to those previously reported by the Emory researchers.

> A well-circumscribed region of speckled hyper- and hypoautofluoresence was centered around the macula, often with extension around the optic disc and even into the periphery.  A peripapillary halo of hypoautofluorescence was noted in all affected eyes.  The hyperautofluorescent lesions corresponded with focal areas of hyperpigmentation on the color fundus photography and focal areas of hyper-reflective RPE thickening with cross-sectional and en face OCT.

84.     In regard to exposure to higher dosages of PPS, the authors identified: "A more widespread pattern of autofluorescent alterations or even a severe pattern of diffuse chorioretinal atrophy were appreciated with more significant toxic exposures.

85.     The authors concluded "The prevalence of toxicity within this study cohort was noted to be 20%, which is remarkable" and warned that "PPS can lead to vision-alerting changes in the macula."

86.     Throughout this time, and until June 16, 2020, the **WARNINGS** section of the Elmiron prescribing information was quite succinct.  Until June 16, 2020, under **WARNINGS**, Defendant Janssen simply said "None."

87.     Finally, in June of 2020, after Elmiron had been on the market for 24 years, Defendant Janssen revised the Warnings section of the label.  Instead of saying "None," Defendant added a paragraph to the Warnings entitled **Retinal Pigmentary Changes**:

> Pigmentary changes in the retina, reported in the literature as pigmentary maculopathy, have been identified with long-term use of ELMIRON (see ADVERSE REACTIONS).  Although most of these cases occurred after 3 years of use or longer, cases have been seen with a shorter duration of use.  While the etiology is unclear, cumulative dose appears to be a risk factor.  Visual symptoms in the reported cases included difficulty reading, slow adjustment to low or reduced light environments, and blurred vision.  The visual consequences of these pigmentary changes are not fully characterized.  Caution should be used in patients with retinal

pigment changes from other causes in which examination findings may confound the appropriate diagnosis, follow-up and treatment.  Detailed ophthalmologic history should be obtained in all patients prior to starting treatment with ELMIRON.  If there is a family history of hereditary pattern dystrophy, genetic testing should be considered.   For patients with pre-existing ophthalmologic conditions, a comprehensive baseline retinal examination (including color fundoscopic photography, ocular coherence tomography (OCT), and auto-fluorescence imaging) is recommended prior to starting therapy.  A baseline retinal examination (including OCT and auto-fluorescence imagine) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.   Follow-up retinal examinations should be continued given that retinal and vision changes may progress even after cessation of treatment.

88.   While advising doctors and patients to re-evaluate the risks and benefits of continuing Elmiron treatment if vision problems develop, Defendant wholly failed to reveal that multiple studies, including Janssen's own Phase IV trial, indicated that Elmiron provides no more relief than a placebo.  Therefore, Janssen has encouraged a false analysis to proceed, where physicians and patients assume that some benefit actually does exist to prescribing Elmiron which may justify the risk of vision damage.

89.   The assumption by the medical community that Elmiron actually works is apparent in the 2019 article conducted at UCLA with Wang as lead author.  The authors state:

> The symptoms of IC can be especially burdensome, and discontinuation of PPS due to the risk of progressive vision loss must be weighed against the benefits of symptom relief, especially when alternative treatments have already been exhausted. Ophthalmologists should manage PPS-associated maculopathy on a case-by-case basis and approach the subject of PPS discontinuation with caution as patients may become distressed and distraught by the recommendation to discontinue PPS therapy.  Open communication with the patient and his or her urologist prescribing the drug is essential.[2]

---

[2] Wang, et al., "Pentosan-associated maculopathy:  prevalence, screening guidelines, and spectrum of findings based on prospective multimodal analysis."  Canadian Journal of Ophthalmology (2020) Vol, No. 55, 116-125.

90.     Defendant's warning remains inadequate as it fails to dispel the belief that Elmiron provides a clinical benefit which must be balanced against the actual risk of significant harm.

91.     Defendant "recommends" in the Elmiron label a dose of 300 mg. a day but provides no instruction or warning against prescribing higher doses.

92.     Defendant's label provides no instruction to stop the use of Elmiron if adverse events occur, stating only that the risks and benefits of continuing treatment should be re-evaluated.

93.     Despite the medical research and literature being conducted by outside physicians, as well as evidence from adverse event reports being reported to Defendant, Defendant did not change the label for Elmiron until June 16, 2020, to warn of visual changes such as difficulty reading, slow adjustment to low or reduced light environments and blurred vision and retinal eye damage associated with the use of Elmiron.

94.     Defendants knew or should have known of the significant risk of vision and eye damage, including retinal pigmentary maculopathy, from the use of Elmiron, yet they failed to provide any warning to physicians or consumers, including Plaintiff, until June 16, 2020.

95.     Consumers, including Plaintiff, who has used Elmiron for the symptoms associated with interstitial cystitis, have safer alternative treatments available to treat interstitial cystitis.

96.     Furthermore, a recent 2022 epidemiology study establishes a causal relationship between Elmiron and maculopathy.[3]  This retrospective cohort study used a large health claims database and subjects were selected from 2006 to 2020.  The results of the study reported an adjusted hazard ratio for maculopathy in Elmiron users was 2.64 [95% confidence interval [CI] 1.90 – 3.68].  The study also examined the length of Elmiron use and noted a cumulative duration-response pattern was observed, with use greater than 3 years having a 9.5-fold risk of maculopathy [HR = 9.56, 95% CI: 3.60 – 25.37] compared to a 2.3-fold risk of maculopathy with use for one year or less [HR = 2.27, 95% CI: 1.50 – 3.43].  The authors concluded, "[t]he results of this study suggest an increased risk of maculopathy with PPS use, particularly with longer duration use."

### Plaintiff KellyJo Robinson's Use and Injuries from Elmiron

97.     Plaintiff KellyJo Robinson was prescribed Elmiron for the treatment of interstitial cystitis.  Plaintiff was prescribed Elmiron by her treating physicians and began treatment with Elmiron in approximately 1998.  Plaintiff was prescribed and took Elmiron in both oral pills and bladder instillation cocktails, administered by her health care providers.  Plaintiff discontinued the use of Elmiron in approximately 2020.

98.     After more than 20 years of using Elmiron, Plaintiff began to experience serious vision and eye issues which only now can be recognized as evidence of Elmiron toxicity.

99.     Plaintiff has suffered and reports problems with her vision including dry eyes, blurry vision, metamorphopsia, and extended time for her eyes to adjust from light/dark.

---

[3] Bae, S., et al., "Risk of Maculopathy with Pentosan Polysulfate Sodium Use," British Journal of Clinical Pharmacology, doi:10.1111/bcp.15303.

100.    As set forth above, Defendant was aware of serious adverse events reported with the use of Elmiron in the Compassionate Use Study and its Phase IV efficacy study. Defendant was further aware of numerous post marketing adverse events reported with the use of Elmiron.

101.    Despite such knowledge, the Warning section of Defendant's label for Elmiron simply stated "none."  It was not until June 16, 2020, that Defendant updated the Elmiron label to warn of retinal pigmentary changes.

102.    During the entire time period that Plaintiff was using Elmiron, Defendant negligently, fraudulently, and knowingly concealed from Plaintiff and/or her physicians that Elmiron could cause serious eye and vision damage.  As a result, Plaintiff and/or her physicians did not know and could not have known any time prior to the June 16, 2020 label change, at the earliest, that use of Defendant's Elmiron could have caused her serious eye and vision damage.

## FIRST CAUSE OF ACTION

### Strict Products Liability
### Design Defect

103.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

104.    Defendant is the manufacturer, designer, marketer, distributor and seller of Elmiron.

105.    The Elmiron manufactured, designed, marketed, distributed, and sold by Defendant was expected to and did reach the consumer, Plaintiff KellyJo Robinson, without any alterations or changes.

106.   The Elmiron manufactured, designed, marketed, distributed, and sold by Defendant was defective in design or formulation, because when it left the hands of the Defendant, the product was unreasonably dangerous and posed an unreasonable risk of physical injury to the consumer.

107.   In particular, with the exception of reports from a single investigation site involving 15 people treated with Elmiron (which was overseen by the inventor of Elmiron) no report from any prospective, placebo-controlled, double-blind studies supports the claim that Elmiron is more effective than a placebo to a statistically significant degree.

108.   The Elmiron manufactured, designed, marketed, distributed, and sold by Defendant was unreasonably dangerous and defective in design or formulation, because when it left the hands of the Defendant, the harmful characteristics and risks inherent in the product design outweighed the utility of the product's design.

109.   Based on the lack of utility, any use of Elmiron to treat patients confers the risk of adverse effects for no benefit.

110.   Defendant's product was unreasonably dangerous and posed a risk of physical injury beyond that which an ordinary consumer would expect – i.e., serious damage to the eye, initially described as atrophic bilateral macular degeneration, amblyopia, blurred vision, double vision, lacrimation, photo sensitivity and visual field defect.

111.   An Elmiron specific eye injury has been identified in the medical literature, described as PPS-associated maculopathy or macular toxicity, which was reasonably foreseeable based upon the experience in the initial trials.   In fact, bilateral macular

degeneration was identified as probably related to Elmiron therapy in the initial studies on Elmiron.

112.    The maculopathy caused by Elmiron has similarities to macular degeneration, and is characterized by blurred vision, distorted vision, difficulty reading, night blindness and/or prolonged light/dark adaptation.

113.    The prognosis for patients who suffer maculopathy due to Elmiron use is unknown.

114.    Other treatments are available for IC, ranging from changes in diet, stress management and bladder training, to invasive surgical procedures.   Several drugs are considered viable options, including amitriptyline, cimetidine, hydroxyzine, cyclosporine A, gabapentinoids, and quercetin.

115.    As a treatment for interstitial cystitis or painful bladder syndrome, Elmiron is rated as a "D" by the Canadian Urology Association, while all other medical therapies score a B or C.

116.    Further, since placebo was shown to be more efficacious in Janssen's own Phase IV study, a sugar pill would be a better option than Elmiron.

117.    The Elmiron manufactured, designed, marketed, distributed, and sold by Defendant is defective in design or formulation as now there is clear evidence that the risks inherent in the product design outweigh the utility of the product.  Despite such knowledge, Defendant continues to manufacture, design, market, distribute and sell Elmiron to consumers, such as Plaintiff, without changing its design or formulation.

118.    No ordinary consumer, including Plaintiff, would accept the risks of Elmiron, including but not limited to significant eye damage, in particular for a drug that provides no or minimal measurable benefit.

119.    The Elmiron manufactured, designed, marketed, distributed, and sold by Defendant was not unavoidably unsafe, because Defendant could have marketed placebo and gotten the same or better results.

120.    Based upon the foregoing, the Elmiron manufactured, designed, marketed, distributed, and sold by Defendant was defective in design at the time it left the Defendant's control.

121.    Plaintiff consumed Elmiron in its defective condition, unaware that it was a defective product.

122.    Defendant's defective design was a substantial factor in causing Plaintiff to suffer damages, including but not limited to: personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

123.    As a direct and proximate result of Defendant's defective drug, Plaintiff has suffered economic damages in the form of the need for future medical monitoring.

124.    Because Plaintiff began treatment with Elmiron in 1998, the significance and extent of exposure to harm is extremely high.

125.    As set forth above, the dangers and seriousness of the harms associated with taking Elmiron for which Plaintiff is at risk cannot be understated.

126.   As set forth above, Defendant's conduct has created an increased risk that Plaintiff will suffer retinal pigmentary changes and/or pigmentary maculopathy due to her use of Elmiron.

127.   As set forth above, the causal association between the use of Elmiron and retinal pigmentary changes and/or pigmentary maculopathy has been established in the medical literature.

128.   Plaintiff has already suffered some ill effects from her use of Elmiron as she has suffered from dry eyes, blurry vision, metamorphopsia, and extended time for her eyes to adjust from light/dark.

129.   Defendant has recently recognized the need for such continued medical monitoring, as the June 2020 label specifically states "[a] baseline retinal examination (including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.  Follow-up retinal examination should be continued given that retinal and vision changes may progress even after cessation of treatment."

130.   Furthermore, the medical literature also establishes that eye and vision damage may continue to occur even after cessation of Elmiron, warranting the need for future medical monitoring.[4]  Thus, monitoring the effects of taking Elmiron is reasonable and necessary.

---

[4] Shah, R., et al., "Disease course in patients with pentosan polysulfate sodium-associated maculopathy after drug cessation."  JAMA Ophthalmology, Aug. 2020, Vol. 138, n. 8, 894-900;

131.    The actions and omissions as alleged in this complaint demonstrate Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

## SECOND CAUSE OF ACTION

### Strict Products Liability
### Failure to Warn / Failure to Instruct

132.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

133.    Defendant is the manufacturer, designer, marketer, distributor, and seller of Elmiron.

134.    The Elmiron manufactured, designed, marketed, distributed and sold by Defendant was defective due to inadequate warning or instruction because at the time it left the control of Defendant and was supplied to Plaintiff, Defendant knew or should have known its product was unreasonably dangerous and not reasonably suited for its intended use as confirmed by the published literature and its own internal data which indicated that it lacked efficacy, and because Elmiron substantially and significantly increases the risk of serious adverse effects including eye and vision damage.

---

Abou-Jaoude, M., "New Insights into Pentosan Polysulfate maculopathy," OSLI Retina, Jan. 2020, Vol. 52, no. 1, 13-22; Abou-Jaoude, M., "Update on maculopathy secondary to pentosan pulysulfate toxicity," Curr. Opin. Ophthalmol., 2021, Vol. 32, no. 00.

135.   Despite the fact that Defendant knew or should have known about the increased risk of serious adverse effects with Elmiron, Defendant failed to exercise reasonable care to adequately warn of the increased risk and dubious efficacy.

136.   The Elmiron manufactured and supplied by Defendant was defective due to inadequate warning or instruction because at the time it left the control of Defendant and was supplied to Plaintiff, Defendant knew or should have known that its product was unreasonably dangerous and not reasonably suited for its intended use, as confirmed by the extensive body of published literature and its own internal data, in that higher doses and long term use of Elmiron substantially and significantly increased the risk of serious adverse effects, including serious eye damage, compared to lower doses or short term use.

137.   Despite the fact that Defendant knew or should have known about the increased risk with higher doses and long term use of Elmiron as compared to lower doses for shorter time frames, Defendant failed to exercise reasonable care to adequately warn of the increased risk with higher exposure to Elmiron.  In fact, Defendant made no reference in the Elmiron product label to the risk of long-term use or higher doses.

138.   Defendant had a duty to warn Plaintiff of the above-mentioned risks because Plaintiff, as an "ordinary consumer with the ordinary knowledge of [Elmiron] common to the community" would not and did not realize the dangers or risks involved with using the product.

139.   Rather than providing a warning containing accurate information about the risks and benefits of Elmiron, Defendant's one word statement in the Warnings section of the Elmiron prescribing information was "None."

140.   The Elmiron manufactured and supplied by Defendant was defective due to inadequate warning or instruction because at the time it left the control of Defendant and was supplied to Plaintiff, Defendant knew or should have known that its product was unreasonably dangerous and not reasonably suited for its intended use, as confirmed by the published literature and its own internal data, because ingestion of Elmiron substantially and significantly increases the risk of serious adverse effects compared to dubious proof of efficacy.

141.   The Elmiron manufactured and supplied by Defendant was also defective due to inadequate post-marketing warning or instruction, because after Defendant knew or should have known of the extremely questionable efficacy of the drug and the substantially increased risks as described above, Defendant failed to provide adequate and/or timely post-market warnings to consumers and/or their health care providers, and failed to revise the Elmiron label to warn of the serious and substantially increased risk of serious adverse effects caused by Elmiron as compared to its very questionable efficacy.

142.   Defendant also failed to issue adequate and/or timely post-market warnings that higher levels of exposure in terms of dosage or length of time significantly increased the risk of serious eye damage.

143.   The significantly increased risk of harm from Elmiron and/or its lack of efficacy are properties of Elmiron that are not an open and obvious danger or a matter of common knowledge.

144.   Upon information and belief, after initial marketing approval of Elmiron by the FDA, Defendant failed to provide and/or misrepresented to the FDA material and

relevant information regarding the performance of Elmiron and the increased risk of serious adverse eye and vision injuries from Elmiron.

145.     Plaintiff was prescribed and ingested Elmiron for many years based upon the Defendant's representations to Plaintiff and/or her physicians that the drug was safe and effective for the treatment of interstitial cystitis.

146.     Had Plaintiff and/or her physicians been aware of the serious safety risks of Elmiron and/or its questionable benefits, Plaintiff would not have taken Elmiron.

147.     Defendant's failure to give adequate warnings and instructions was a substantial factor in causing Plaintiff to suffer damages, including but not limited to: personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

148.     As a direct and proximate result of Defendant's defective drug, Plaintiff has suffered economic damages in the form of the need for future medical monitoring.

149.     Because Plaintiff began treatment with Elmiron in 1998, the significance and extent of exposure to harm is extremely high.

150.     As set forth above, the dangers and seriousness of the harms associated with taking Elmiron for which Plaintiff is at risk cannot be understated.

151.     As set forth above, Defendant's conduct has created an increased risk that Plaintiff will suffer retinal pigmentary changes and/or pigmentary maculopathy due to her use of Elmiron.

152.   As set forth above, the causal association between the use of Elmiron and retinal pigmentary changes and/or pigmentary maculopathy has been established in the medical literature.

153.   Plaintiff has already suffered some ill effects from her use of Elmiron as she has suffered from dry eyes, blurry vision, metamorphopsia, and extended time for her eyes to adjust from light/dark.

154.   Defendant has recently recognized the need for such continued medical monitoring, as the June 2020 label specifically states "[a] baseline retinal examination (including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.  Follow-up retinal examination should be continued given that retinal and vision changes may progress even after cessation of treatment."

155.   Furthermore, the medical literature also establishes that eye and vision damage may continue to occur even after cessation of Elmiron, warranting the need for future medical monitoring. Thus, monitoring the effects of taking Elmiron is reasonable and necessary.

156.   The actions and omissions as alleged in this complaint demonstrate Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

# THIRD CAUSE OF ACTION

## Negligence

157.    Plaintiff hereby incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

158.    Defendant is the manufacturer, designer, marketer, distributor, and seller of Elmiron.

159.    Defendant had a duty to exercise reasonable care in the design, manufacture, testing, sale and/or distribution of Elmiron, including a duty to ensure that Elmiron did not pose a significantly increased risk of bodily harm and adverse events.

160.    Defendant failed to exercise ordinary care in the design, formulation, manufacture, testing, distribution, marketing, labeling and sale of Elmiron in that Defendant knew, or should have known, that Elmiron was not effective, caused significant bodily harm, and was not safe for use by consumers as the risks posed by Elmiron outweighed any benefits.

161.    Defendant also failed to exercise ordinary care in the labeling of Elmiron and failed to issue to consumers, and/or their health care providers, adequate warnings of the increased risk of injury from the use of Elmiron.

162.    Despite the fact that Defendant knew or should have known that Elmiron was not effective and posed a foreseeable serious and increased risk of physical injury to consumers, Defendant continue to manufacture, market, sell, and distribute Elmiron for use by consumers and failed to disclose information about the increased risk of injury from Elmiron.

163.   Defendant's negligence was a substantial factor in causing Plaintiff to suffer damages, including but not limited to: personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

164.   As a direct and proximate result of Defendant's defective drug, Plaintiff has suffered economic damages in the form of the need for future medical monitoring.

165.   Because Plaintiff began treatment with Elmiron in 1998, the significance and extent of exposure to harm is extremely high.

166.   As set forth above, the dangers and seriousness of the harms associated with taking Elmiron for which Plaintiff is at risk cannot be understated.

167.   As set forth above, Defendant's conduct has created an increased risk that Plaintiff will suffer retinal pigmentary changes and/or pigmentary maculopathy due to her use of Elmiron.

168.   As set forth above, the causal association between the use of Elmiron and retinal pigmentary changes and/or pigmentary maculopathy has been established in the medical literature.

169.   Plaintiff has already suffered some ill effects from her use of Elmiron as she has suffered from dry eyes, blurry vision, metamorphopsia, and extended time for her eyes to adjust from light/dark.

170.   Defendant has recently recognized the need for such continued medical monitoring, as the June 2020 label specifically states "[a] baseline retinal examination

(including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.  Follow-up retinal examination should be continued given that retinal and vision changes may progress even after cessation of treatment."

171.    Furthermore, the medical literature also establishes that eye and vision damage may continue to occur even after cessation of Elmiron, warranting the need for future medical monitoring.  Thus, monitoring the effects of taking Elmiron is reasonable and necessary.

172.    The actions and omissions as alleged in this complaint demonstrate Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

**FOURTH CAUSE OF ACTION**

**Fraud**

173.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

174.    Defendant manufactures, designs, markets, labels, distributes, and sells Elmiron.

175.    Defendant had a duty to provide truthful information about its prescription drug Elmiron to Plaintiff, consumers, and their physicians, and a duty not to deceive them.

176.    Defendant is responsible for the accuracy and truthfulness of its product labeling at all times.

177.    Defendant had the duty to provide accurate prescribing information regarding Elmiron to Plaintiff, consumers, and/or their physicians, which included adding or strengthening any contraindication, warnings, precautions, or adverse reactions provided in the product label. *See* 21 C.F.R. §314.70(c)(6)(iii)(A).

178.    Defendant had the duty to delete false, misleading, or unsupported indications for use or claims for effectiveness from the label for Elmiron.   *See* 21 C.F.R. §314.70(c)(6)(iii)(D).

179.    As set forth herein, Defendant made material and false representations to consumers, such as Plaintiff, and their physicians regarding the character and/or quality of Elmiron for guidance in their decision to select Elmiron for Plaintiff's use.

180.    Specifically, Defendant falsely represented that Elmiron was safe and effective as it was indicated for the treatment of IC and instructed patients, including Plaintiff, that Elmiron "must be taken continuously for relief as prescribed."

181.    Defendant knew its representation that Elmiron was effective for the treatment of IC was false and/or it was ignorant of the truth.

182.    Defendant falsely represented Elmiron was effective, and while patients in its clinical trial (Study E-002) who received Elmiron reported a statistically significant improvement in bladder pain, these statistics represented only a single data point from

among multiple analysis in the study which were contradicted by other findings.  Defendant also knew that the data from this study was suspect based upon 1) the input from Dr. Parsons, who had a financial interest in the outcome and who provided outlier results completely opposite to those of all the other investigators, 2) the fact that multiple analysis were conducted without performing the Bonferroni statistical correction, and 3) the fact that results from the self-assessment of change in pain scores at three months for patients treated with Elmiron (66%) versus placebo (52%) was not significantly different.

183.    Subsequently, in its Phase IV 2015 study, Defendant stated: "Results of this study in a broad population of patients with symptoms consistent with interstitial cystitis revealed no treatment effect vs placebo for pentosan polysulfate sodium at the currently established dose or at a third of the daily dose."  Yet, Defendant failed to disclose that the study was terminated early due to lack of efficacy and continued to market the drug for treatment of IC and claimed "we do not believe that this study can be used to justify abandoning one of the few medications with significant clinical trial and experience support for treating IC/BPS…"

184.    Defendant falsely represented that "in preliminary clinical models, pentosan polysulfate sodium adhered to the bladder wall mucosal membrane.  The drug may act as a buffer to control cell permeability preventing irritating solutes in the urine from reaching the cells."

185.    However, Defendant knew such representation was false and/or it was ignorant of the truth as prior studies had already established that "the mucous surface layer

is identical morphologically to that of controls…" thus completely debunking this theoretical method of action.

186.    Defendant falsely represented that Elmiron was safe for use for the treatment of interstitial cystitis.

187.    However, Defendant knew the representations that Elmiron was safe for use was false and/or it was ignorant of the truth as multiple patients in its clinical trials and subsequent adverse events reported to Defendant included reports of serious eye and/or vision problems after exposure to Elmiron. Yet, Defendant provided no warning of any kind in its labeling for Elmiron about vision problems, or any problems.  The only word provided by Defendant under Warnings was "None."

188.    As to the false representations set forth above, Defendant acted with the intent that such representations were reasonably expected to be acted and relied upon by consumers, such as Plaintiff, and their physicians when making decisions to prescribe and use Elmiron for the treatment of interstitial cystitis.

189.    Plaintiff and her physicians were unaware that such representations concerning the serious risks posed by Elmiron in the product's labeling, advertisements, and promotions were false, and justifiably relied to their detriment upon Defendant's false representations.

190.    Plaintiff and her physicians were unaware the representations that Elmiron was a safe and effective method of treating IC which must be taken continually to obtain relief were false, and justifiably relied to their detriment upon Defendant's false representations.

191.   Defendant's false representations were a substantial factor in causing Plaintiff to ingest Elmiron and to suffer damages, including but not limited to:  personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

192.   Defendant charged consumers, including Plaintiff, per month for Elmiron. Plaintiff acted in justifiable reliance upon Defendant's representations that Elmiron was a safe and effective treatment for IC and was misled and defrauded into paying for Elmiron treatment several years, thereby entitling Plaintiff to recoup the costs of Elmiron from Defendant.

193.   As a direct and proximate result of Defendant's defective drug, Plaintiff has also suffered economic damages in the form of the need for future medical monitoring.

194.   Because Plaintiff began treatment with Elmiron in 1998, the significance and extent of exposure to harm is extremely high.

195.   As set forth above, the dangers and seriousness of the harms associated with taking Elmiron for which Plaintiff is at risk cannot be understated.

196.   As set forth above, Defendant's conduct has created an increased risk that Plaintiff will suffer retinal pigmentary changes and/or pigmentary maculopathy due to her use of Elmiron.

197.   As set forth above, the causal association between the use of Elmiron and retinal pigmentary changes and/or pigmentary maculopathy has been established in the medical literature.

198.    Plaintiff has already suffered some ill effects from her use of Elmiron as she has suffered from dry eyes, blurry vision, metamorphopsia, and extended time for her eye to adjust from light/dark.

199.    Defendant has recently recognized the need for such continued medical monitoring, as the June 2020 label specifically states "[a] baseline retinal examination (including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.  Follow-up retinal examination should be continued given that retinal and vision changes may progress even after cessation of treatment."

200.    Furthermore, the medical literature also establishes that eye and vision damage may continue to occur even after cessation of Elmiron, warranting the need for future medical monitoring.  Thus, monitoring the effects of taking Elmiron is reasonable and necessary.

201.    The actions and omissions as alleged in this complaint demonstrate Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

## FIFTH CAUSE OF ACTION

### Negligent Misrepresentation

202.   Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

203.   Defendant manufactures, designs, markets, labels, distributes, and sells Elmiron.

204.   Defendant had a duty to provide truthful information about its prescription drug Elmiron to Plaintiff, consumers, and their physicians, and a duty not to deceive them.

205.   Defendant is responsible for the accuracy and truthfulness of its product labeling at all times.

206.   Defendant had the duty to provide accurate prescribing information regarding Elmiron to Plaintiff, consumers, and/or their physicians, which included adding or strengthening any contraindication, warnings, precautions, or adverse reactions provided in the product label.  *See* 21 C.F.R. §314.70(c)(6)(iii)(A).

207.   Defendant had the duty to delete false, misleading, or unsupported indications for use or claims for effectiveness from the label for Elmiron.  *See* 21 C.F.R. §314.70(c)(6)(iii)(D).

208.   As set forth herein, Defendant, in the course of its marketing, labeling, sale and distribution of Elmiron, provided incorrect and false information to consumers, such as Plaintiff, and their physicians regarding the character and/or quality of Elmiron for guidance in their decision to select Elmiron for Plaintiff's use.

209.   Specifically, Defendant provided incorrect and false information that Elmiron was safe and effective as it was indicated for the treatment of IC and instructed patients, including Plaintiff, that Elmiron "must be taken continuously for relief as prescribed."

210.   Defendant failed to exercise reasonable care in communicating its representation that Elmiron was effective for the treatment of IC.

211.   Defendant provided incorrect and false information that Elmiron was effective, and while patients in its clinical trial (Study E-002) who received Elmiron reported a statistically significant improvement in bladder pain, these statistics represented only a single data point from among multiple analysis in the study which were contradicted by other findings.  Defendant also knew that the data from this study was suspect based upon 1) the input from Dr. Parsons, who had a financial interest in the outcome and who provided outlier results completely opposite to those of all the other investigators, 2) the fact that multiple analysis were conducted without performing the Bonferroni statistical correction, and 3) the fact that results from the self-assessment of change in pain scores at three months for patients treated with Elmiron (66%) versus placebo (52%) was not significantly different.

212.   Subsequently, in its Phase IV 2015 study, Defendant stated: "Results of this study in a broad population of patients with symptoms consistent with interstitial cystitis revealed no treatment effect vs placebo for pentosan polysulfate sodium at the currently established dose or at a third of the daily dose."  Yet, Defendant failed to disclose that the study was terminated early due to lack of efficacy and continued to market the drug for treatment of IC and claimed "we do not believe that this study can be used to justify abandoning one of the few medications with significant clinical trial and experience support for treating IC/BPS…"

213.   Defendant provided incorrect and false information that "in preliminary clinical models, pentosan polysulfate sodium adhered to the bladder wall mucosal membrane.  The drug may act as a buffer to control cell permeability preventing irritating solutes in the urine from reaching the cells."

214.   However, Defendant failed to exercise reasonable care in communicating such information as prior studies had already established that "the mucous surface layer is identical morphologically to that of controls…" thus completely debunking this theoretical method of action.

215.   Defendant provided incorrect and false information that Elmiron was safe for use for the treatment of interstitial cystitis.

216.   Defendant failed to exercise reasonable care in communicating that Elmiron was safe for use as multiple patients in its clinical trials and subsequent adverse events reported to Defendant included reports of serious eye and/or vision problems after exposure to Elmiron. Yet, Defendant provided no warning of any kind in its labeling for Elmiron about vision problems, or any problems.  The only word provided by Defendant under Warnings was "None."

217.   As to the incorrect and false representations set forth above, Defendant failed to exercise reasonable care in communicating such information and it was reasonably foreseeable that such incorrect and false representations would be acted and relied upon by consumers, such as Plaintiff, and their physicians when making decisions to prescribe and use Elmiron for the treatment of interstitial cystitis.

218.    Plaintiff and her physicians justifiably relied to their detriment upon Defendant's incorrect and false representations that Elmiron was effective for the treatment of interstitial cystitis, and it was safe for use.

219.    Defendant's false representations were a substantial factor in causing Plaintiff to ingest Elmiron and to suffer damages, including but not limited to:  personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

220.    Defendant charged consumers, including Plaintiff, per month for Elmiron. Plaintiff acted in justifiable reliance upon Defendant's representations that Elmiron was a safe and effective treatment for IC and was misled and defrauded into paying for Elmiron treatment several years, thereby entitling Plaintiff to recoup the costs of Elmiron from Defendant.

221.    As a direct and proximate result of Defendant's defective drug, Plaintiff has also suffered economic damages in the form of the need for future medical monitoring.

222.    Because Plaintiff began treatment with Elmiron in 1998, the significance and extent of exposure to harm is extremely high.

223.    As set forth above, the dangers and seriousness of the harms associated with taking Elmiron for which Plaintiff is at risk cannot be understated.

224.    As set forth above, Defendant's conduct has created an increased risk that Plaintiff will suffer retinal pigmentary changes and/or pigmentary maculopathy due to her use of Elmiron.

225.    As set forth above, the causal association between the use of Elmiron and retinal pigmentary changes and/or pigmentary maculopathy has been established in the medical literature.

226.    Plaintiff has already suffered some ill effects from her use of Elmiron as she has suffered from dry eyes, blurry vision, metamorphopsia, and extended time for her eye to adjust from light/dark.

227.    Defendant has recently recognized the need for such continued medical monitoring, as the June 2020 label specifically states "[a] baseline retinal examination (including OCT and auto-fluorescence imaging) is suggested for all patients within six months of initiating treatment and periodically while continuing treatment.  If pigmentary changes in the retina develop, then risks and benefits of continuing treatment should be re-evaluated, since these changes may be irreversible.  Follow-up retinal examination should be continued given that retinal and vision changes may progress even after cessation of treatment."

228.    Furthermore, the medical literature also establishes that eye and vision damage may continue to occur even after cessation of Elmiron, warranting the need for future medical monitoring.  Thus, monitoring the effects of taking Elmiron is reasonable and necessary.

229.    The actions and omissions as alleged in this complaint demonstrate Defendant consciously pursued a course of conduct knowing it created a substantial risk of significant harm to others and/or acted with an evil mind so as to warrant the imposition of punitive damages.

**SIXTH CAUSE OF ACTION**

**Breach of Express Warranty**

230.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

231.    At the time Defendant manufactured, marketed, sold, distributed and/or supplied Elmiron, Defendant expressly warranted that Elmiron is indicated to treat the pain or discomfort of IC and must be taken continuously for relief as prescribed.

232.    The Elmiron manufactured and sold by Defendant did not conform to this express representation because Elmiron provides no relief to the majority of patients, is less efficacious than placebo in Defendant's own study, and exposed patients to the risk of serious injury.

233.    On the basis of Defendant's affirmations and representations, Plaintiff purchased and ingested Elmiron for the treatment of IC.

234.    Defendant's breach of warranty was a substantial factor in causing Plaintiff to ingest Elmiron and suffer damages, including but not limited to: personal injury, bodily harm, emotional distress, pain and suffering, permanent physical injury, loss of enjoyment of life, economic and non-economic damages, and will continue to suffer such injuries, distress, pain and suffering, harm, damages, and economic loss in the future.

235.    Defendant's breach of warranty caused Plaintiff to ingest Elmiron and to suffer economic loss, including but not limited to: the amount that Plaintiff was charged for treatment with Elmiron for several years.

### SEVENTH CAUSE OF ACTION

### Unjust Enrichment

236.    Plaintiff incorporates by reference, as if fully set forth herein, each and every allegation set forth in the preceding paragraphs and further alleges as follows.

237.    As the intended and expected result of their conscious wrongdoing, Defendant has profited and benefited from Plaintiff's long-term use and purchase of Elmiron, as well as from other consumers' use and purchase of Elmiron.

238.    Defendant has voluntarily accepted and retained those profits and benefits, derived from Plaintiff and other consumers, with full knowledge and awareness that, as a result of Defendant's fraud and other conscious and intentional wrongdoing, Plaintiff and other consumers were not receiving a product of the quality, nature, or fitness that had been represented by Defendant, or that, as a reasonable consumer, they expected to receive.

239.    By virtue of the conscious wrongdoing alleged above, Defendant has been unjustly enriched at the expense of Plaintiff and other consumers, and Plaintiff is entitled in equity to, and hereby seeks, the disgorgement and restitution of Defendant's wrongful profits, revenues, and benefits to the extent and in the amount deemed appropriate by the Court; and such other relief as the Court deems just and proper to remedy Defendant's unjust enrichment.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against the Defendant on each of the above-referenced claims and Causes of Action and further demands as follows:

1.      Compensatory damages in excess of the $75,000 jurisdictional amount, including but not limited to compensation for injury, pain, suffering, mental anguish, emotional distress, loss of enjoyment of life, permanent physical injury, and other non-economic damages in an amount to be determined at trial of this action;

2.      Economic damages in the form of reimbursement for costs of Elmiron, medical expenses, out-of-pocket expenses, lost earnings, and other economic damages in an amount to be determined at trial of this action;

3.      Economic damages in the form of future medical monitoring;

4.      Punitive Damages;

5.      Disgorgement of profits;

6.      Attorneys' fees, expenses, and costs of this action; and

7.      Such further relief as this Honorable Court deems necessary, just, and proper.

### DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial by jury as to all issues which can be so tried.

**RESPECTFULLY SUBMITTED, this 1st day of June, 2022.**

_/s/ Paul D. Friedman_
Paul D. Friedman
**BURG SIMPSON ELDREDGE
HERSH & JARDINE, PC**
2390 East Cambelback Rd., Suite 403
Phoenix, Arizona 85016
_Attorney for Plaintiff KelleyJo Robinson_

1

2

3

4   ***Of Counsel:***
    Melanie. S. Bailey (OH 0075821)
5   David C. Harman (OH 0087882)
    **BURG SIMPSON ELDREDGE**
6   **HERSH & JARDINE, P.C.**
    201 East Fifth Street, Suite 1340
7   Cincinnati, OH 45202
    Phone: (513) 852-5600
8   Fax: (513) 852-5611
    mbailey@burgsimpson.com
9   dharman@burgsimpson.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28